Douglas L. Rappaport (CA SBN 136194)
LAW OFFICES OF DOUGLAS RAPPAPORT
260 California Street, Suite 1002
San Francisco, CA 94111
415-989-7900
admin@sfcrimlaw.com

Joanna Sheridan (CA SBN 260090)
J.P. SHERIDAN LAW
601 Montgomery Street, Suite 850
San Francisco, CA 94111
415-347-2700
joanna@jpsheridanlaw.com

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>STEVEN BROWN,<br><br>                    Defendant | Case No.:  3:18CR00081-001 CRB<br><br>DEFENDANT STEVEN BROWN'S<br>SENTENCING MEMORANDUM |

## INTRODUCTION

To his friends, family and employees, Steven Brown is known as a man with a heart of gold. He was charitable both in his personal life, as well as during his 38 years at the helm of Better Property Management (BPM), where he provided job training, employment and emotional support to many who were struggling to get ahead in life. Everything changed in 2003, when Steven's son David died suddenly of an epileptic seizure. Grief, then depression, overwhelmed him and as he tried to move on and focus on his work, Steven became more like a father to his employees. He could not bring himself to lay off older workers or to cut their benefits, and over

time his loyalty put an increasing financial strain on BPM. Eventually, Steven made what he described as the "worst decision of my life" and, in December 2012, began using funds held in trust on behalf of five Home Owner Associations (HOAs) to keep BPM afloat.

Steven's motivation was never to enrich himself, and the Browns did not live a lavish lifestyle. In fact, the they downsized their lives including by selling their family home and moving into a rental during the two-and-a-half-year period when the conduct in this case occurred. Despite his best efforts to return the funds before any harm befell the HOAs, Steven was only able to repay $134,560.22 of the $230,496.58 loss before indictment. Two of the five HOAs have been made whole, and Mr. Brown is committed to making full restitution to atone for his wrongdoing.

## SENTENCING RECOMMENDATION

It is respectfully requested that Mr. Brown be sentenced to probation, and if any term of confinement is imposed, that it be served via home detention. This request is being made for several reasons, including the nature and circumstances of the offense, Mr. Brown's history and personal characteristics, as well as the need for restitution to the remaining three HOAs. 18 USC § 3553 (a)(1) and (7).

### I.      A Sentence of Probation is Legally Permissible.

Mr. Brown was convicted in Count 1 of a violation of 18 USC § 1343, Wire Fraud, a class C felony, meaning that Mr. Brown is eligible for probation for not less than one, nor more than five years. 18 USC § 3561(c)(1). Under the advisory guidelines, Offense Level 16 falls within Zone D, for which a term of imprisonment is recommended, but this Court may vary downward in light of the 18 USC § 3553 factors apparent in this case. The probation department recommends a downward variance to 18 months incarceration, but in light of the human factors addressed herein, the defense asks the Court to vary downward further and impose a term of probation.

### II.     Steven Brown's History and Characteristics - 18 USC § 3553(a)(1)
### A.      The Formative Years

DEFENDANT STEVEN BROWN'S SENTENCING MEMORANDUM - 2

Steven Brown was born in New York to a working-class family. His father was a compulsive gambler who was rarely home during the week. Steven was raised by his mother, and when she had to go to work to support the family, by his elder sister. As his wife Shirley writes in her letter to the Court, "Very few mothers worked in the 50's and 60's, and Steven hated his mother working. She left early in the morning and came home late." (See, Letter of Shirley Brown, attached hereto as Exhibit A) During these formative years, Steven's mother taught him to always smile and pretend everything was fine so that others would think the family was normal. (PSR ¶ 35).

His father's gambling only worsened over time and Steven remembers that the telephone in his home rang frequently with bookies calling to collect his father's debts. At the age of 12, Steven started working to help his family financially. He was proud to help but embarrassed by his father's behavior and never able to express these feelings. A low point for Steven happened when his father stole his Bar Mitzvah money to gamble. (PSR ¶ 35). "The lesson he learned from his childhood was that he would never gamble. He wanted to work hard and become successful and give his family what he never had. He also developed the need to help the under-dog and less fortunate." (Exhibit A).

### B.    Steven's Big Heart was his Best Attribute and Biggest Flaw.

Steven Brown's friends, family and work colleagues who have written to the Court on his behalf all agree that he has a big heart. In the words of his Rabbi, Nat Ezray of Congregation Beth Jacob in Redwood City, "His care for people in our community has been displayed numerous times…His concern for others is deeply felt and part of his essence." (See, Rabbi Ezray letter, attached hereto as Exhibit B).

Long-time family friend Debra Herz recalls one example of Steven caring nature. When her son Jordan was a teenager, "he began associating with other kids that weren't a good influence. We became concerned as parents that Jordan was heading down a path that could lead him into serious trouble. Steven took the time to talk to Jordan and help to steer him down a path that was healthier and productive. …[Steven] helped him to get back on track by motivating Jordan and giving Jordan an additional positive adult role model." Steven also later hired Jordan and found work for him to do when Jordan was deciding on a career path. "This was just a small example of Steven's personality, which is one of caring and concern for others." (See, Letter of Debra Herz, attached hereto as Exhibit C).

DEFENDANT STEVEN BROWN'S SENTENCING MEMORANDUM - 3

Steven's son David was "the light of the family, always the jokester with the widest smile on his face." (Exhibit C). David also suffered from epilepsy and was very sick as a child, so Shirley did not work outside the home when David and his sister Rebecca were young. At the age of 20, David was living at home but had not had a seizure for a number of years. Then, on a Saturday morning in 2003 Steven went to his son's room to kiss him goodbye, as he did every morning before leaving for work, and found David's lifeless body. "At that moment, the light in Steven's eyes dimmed and his laughter ceased for quite a long time….it was obvious that their lives had been changed so drastically and would never be the same." (*Id*).

After David's death, Steven's desire to take care of everyone became more of a liability. In Shirley's words, "[m]y husband, like all of us is flawed. His biggest flaw is his heart. He wanted to take care of everyone. He built homes for habitat for humanity, worked at the soup kitchen, worked as an usher at our temple and supported Jewish charities and the epilepsy foundation. He took his friends with H.I.V to the doctor and cared for them… He hired the painter who couldn't paint anymore because of a bad back as the company bookkeeper, and so on and so on." (Exhibit A).

It was as if Steven tried to fill the hole left by his son by helping others. Rabbi Nat Ezray observes that "[i]n exploring his behavior, it is clear to me that his criminal actions only began in the aftermath of David's death and were in some way related to the pain that Steve carried after the loss of his son." (Exhibit B). In 2003 Steven was diagnosed with Major Depression, which is now in remission after treatment and medication, but he continues to be treated for Dysthymia. (See, Letter from Dr. Wolfson, Attached hereto as Exhibit D). Steven also continues to work with Rabbi Ezray, who writes that "Steve has been very open with ne and is genuinely seeking to understand and change. He sees aspects of his personality that contributed to his mistakes and wants to work through those issues. I believe his desire to confront his actions and take full responsibility is real." (Exhibit B).

### C.    A Sentence of Imprisonment will have an Undue Impact on Shirley Brown.

Steven and Shirley have been married for 44 years. Shirley writes that she "fell in love with him because he was the kindest, most loving, considerate, non-judgmental, polite, smart and funny man I had ever met." (Exhibit A). She goes on to say that, "[d]espite his flaws, without him I would be lost. Steven was the first person in my life who made me feel like I was capable of doing what I set my mind to. I owe him everything."

DEFENDANT STEVEN BROWN'S SENTENCING MEMORANDUM - 4

Shirley's life began in an abusive home. She was emotionally abused by her mother and physically abused by her two brothers. "By the time I was a teenager, I suffered from low self-esteem, convinced that I could never do anything of value…. Steven was my cheerleader. He gave me confidence to do something with myself. He made me feel that what I said had value, that I had value…. I owe him everything and I am committed to him for both the good times and the bad." (*Id*).

If Steven goes into custody, Shirley will not be able to remain in her current rental apartment. She will lose his portion of the social security income, and his company will have to close. Shirley cannot run his business because she suffers from stenosis which limits her mobility. He visits 5 to 10 properties a day and has a personal relationship with each client. (Exhibit A).

Lee L. Pollak, LCS, has been working with Shirley since David's death to address her sometimes crippling anxiety and depression. Through the many stages of mourning, Steven's presence has been a stabilizing presence and his support has helped her to fund courage. With the shadow of Steven's impending legal case, Ms. Pollak writes that Shirley is "frankly overwhelmed, concerned – and rightfully so – about the challenge of surviving financially without Steven….incarceration for him will devastate the life that he and Shirley are trying so hard to maintain, and will devastate Shirley." Ms. Pollak goes on to observe that "Steven has been the one to support her emotionally and financially throughout the marriage, and face his absence, under such extreme circumstances, is forcing Shirley into the most hopeless and helpless stance I have ever experienced with her….As a therapist, I am deeply worried and concerned that, with the loss of Steven by her side, Shirley will become more anxious, more depressed, more hopeless and even suicidal." (See, Letter from Lee L. Pollak, LCSW, attached hereto as Exhibit E).

### III.     The Nature and Circumstances of the Offense – 18 USC § 3553(a)(1)

### A.     Steven Brown's Business became an Extended Family

Steven Brown ran a successful property management and real estate business for over 30 years before the events in this case arose. "Steven's personality was so helpful to the growth of his business. Customers became very loyal to him." (See, Letter of Kenneth Birke, attached hereto as Exhibit F). He "cherished his business and clients" writes Hal Wilmer, who has known the Browns for 38 years. "Steven is not the kind of person who would set about to harm another,

he is in fact just the opposite: a caring person who was very proud of the business he built over many years." (See, Letter of Hal Wilmer, attached hereto as Exhibit G).

Given his upbringing, Steven used his business as a means to help those who he saw as underdogs in life. His secretary of 16 years, Alana Makaya, writes that Steven "gave me my first job right out of college even thought I had no experience and took the time to diligently and faithfully train me. Without him, I would not have the career I do today." (See, Letter of Alana Makaya, attached hereto as Exhibit H). Ms. Makaya's sentiments are echoed by Mel Camhi, who suffered from PTSD and was hired by Mr. Brown to help manage properties. "Had it not been for Steve, my life might have turned out very differently and not for the better." (See, Letter of Mel Camhi, attached hereto as Exhibit I). Mr. Brown also hired his secretary's mother when she was between jobs, gave her godson a "job" of taking out trash, and hired a homeless gentleman named "Willie" to wash his car on a regular basis. (Exhibit H). He hired and paid for an attorney to help his Leasing Supervisor when her mother passed away, and continued to pay for her private health insurance, even after he she qualified for Medicare, because she was resistant to enrolling. (See, Letter from Felice Kaplan, attached hereto as Exhibit J).

"We were like a family" writes Ms. Makaya, "and for me this was very meaningful because my own father was not able to actively be in my life. Mr. Brown took his place in many ways, and has shown me, and many, many others, a lot of love." (Exhibit H). Mr. Brown's real estate agent at BPM for 13 years, Thomas Redmond, recalls that when his drinking became a problem in 1998-1999, "Steve was supportive and helped me work toward sobriety. He agreed that I could attend AA meetings over lunch and during working business hours, encouraged me to stay sober, and found ways to modify my role in events when we were entertaining clients and booze was involved. …His faith in me helped me to have faith in myself, and he continues to be supportive in my sobriety and others in recovery to this day." (See, Letter of Thomas Redmond, Attached hereto as Exhibit K).

### B.    Attachment to his Employees lead Steven to Make Poor Business Decisions

Daniel Edelman, a retired president of a national retailer who has known Steven Brown for over 30 years, writes that he may have "some insight into Steven's decision-making process over the years that may be relevant to the sentence he receives in this case. Steven and I would routinely talk about business issues over the years. He told me that he paid 100% of his employee's healthcare costs, and I told him I thought he was crazy for doing that. I told him that

no one pays 100% anymore. He always defended his practice, stating he wanted to take care of his employees, many who had worked for him for a long time. When Steven told me about the financial mess his business was in leading up to his unlawful taking from the homeowner's accounts, he acknowledged that [he] should have streamlined his business and reduced his costs to avoid the financial trouble." (See, Letter from Daniel Edelman, attached hereto as Exhibit L).

Mr. Edelman's insight is echoed by Glenn Fisher, who has known Steven Brown for nearly 55 years and writes that "[h]e is a good man with a heart of gold, though business acumen is probably not among his many attributes. I remember speaking to Steve about how he could expand his business by hiring someone to manage operations, giving him the opportunity to spend his time doing what he does well: building relationships and selling. Unfortunately, he was always far too loyal to his employees, even when it was abundantly clear they were not effective at their jobs." (See, Letter of Glenn Fisher, attached hereto as Exhibit M).

Mr. Edelman and Mr. Fisher's observations from outside of BPM looking in are strikingly similar to what Thomas Redmond saw from inside the company. Mr. Redmond writes that "[t]oward the end of my time working as an agent with Steven, in approximately 2008, the business model needed a new software system to be competitive in our market. I remember that the critical client portal software implementation was met with a ton of resistance by the same senior employees who seemed to be slacking off, in my opinion. I know that the lack of cooperation by his key employees was extremely frustrating for Steve, but he never let any of his staff go. Steve just tried to make the new software system work by doing it all himself, which is not really a workable solution….This is just the way Steve operated: he was loyal and believed that he could help his employees, where other business owners would have found employees to help the business." (See, Exhibit K).

The stress of new technology pushing the competitive edge in real estate and Steve's un-wavering commitment to his employees reached a breaking point in 2012, when he began to take funds from HOA accounts to keep BPM solvent. Steve repaid some, then took more and repaid a little more, with the scheme lasting two-and-a-half years. Steve's motivation in taking the money was never to enrich himself; "Steven and Shirley have always lived modestly." (See, Exhibit G). As Dan Edelman recalls, they "did not live a lavish lifestyle. In fact, it was apparent to our close group of friends that money was always tight …When we went out to dinner with the Browns we would pick a modestly priced restaurant so as to not make them uncomfortable.

DEFENDANT STEVEN BROWN'S SENTENCING MEMORANDUM - 7

Even before I knew about Steven's criminal case, I could see that Steven was downsizing his life for many years. Now I see the full reason why, and I am saddened by it." (See, Exhibit L).

During the time that he unlawfully took funds the trust funds, Steve confided in his long-term psychiatrist/psychotherapist, Dr. Philip Wolfson about his wrongdoing. Naturally, Dr. Wolfson encouraged Steven to reduce staff and overhead and pay the money back. Dr. Wolfson writes that "I am clear that he was always committed to paying back funds and made strenuous attempts to do so. It was not his morality that was in error – there was always a determined sense of obligation – but rather the lack of success of his financial efforts. His anxiety about this has been ever present and extreme…I have regarded Steve's behavior as mistaken, desperate and ill advised, but not arising from criminal intent. His own financial status has deteriorated throughout and he and his wife lost their house before he was charged. He has survived, but not profited." (See, Exhibit D).

## IV.    The Need for Steven Brown to Make full Restitution - 18 USC § 3553(a)(7)

Before indictment, Steven Brown fully repaid two of the five HOA victims in this case. The remaining restitution is $80,936.36, and Steven is committed to making the remaining three HOAs whole. If he remains at the helm of BPM's property management business, he will be substantially more likely to repay this amount during his lifetime than if he has to start over after a term of imprisonment at the age of 71 with a felony conviction.

If Steven Brown serves a term of incarceration, he will be unable to keep the doors of BPM open. He has no employees who can run the company in his absence. After years of trying to keep his staff at high cost to the business, Steven finally downsized, but it was too little, too late and he was forced to let all of his employees go. When his broker's and real estate licenses were suspended, Steven reduced the business to property management only. At this scale, he can manage on his own visiting the 5-10 properties each day and coordinating maintenance work. He is asking the Court for the opportunity to keep working so that he can repay the remaining three HOAs.

## CONCLUSION

This case arose not from greed, but from Steven Brown's ill-advised drive to take care of his staff when he was no longer able to care for his son. At 69 years of age, Steven has accepted responsibility for his crimes, is sincerely committed to paying restitution and is the

DEFENDANT STEVEN BROWN'S SENTENCING MEMORANDUM - 8

emotional and financial rock for his wife Shirley. Given these unique circumstances, a sentence of probation with home detention is sufficient not greater than necessary to meet the statutory objectives of sentencing.

Respectfully submitted this 3rd day of July, 2019, by:


_____-S-_____
DOUGLAS L RAPPAPORT


_____-S-_____
JOANNA P. SHERIDAN
Attorneys for Defendant
STEVEN BROWN

DEFENDANT STEVEN BROWN'S SENTENCING MEMORANDUM - 9